**UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 1:11-cv-01119-CCB |
| v. ) | |
| ) | Oral Argument Requested |
| HOLCIM (US) INC., et al, ) | |
| ) | |
| Defendants. ) | |


**UNITED STATES' MEMORANDUM IN OPPOSITION TO
<u>DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

## Table of Contents

INTRODUCTION ................................................................................................................ 1

STATUTORY AND REGULATORY BACKGROUND ..................................................... 1

STATEMENT OF FACTS .................................................................................................. 4

LEGAL STANDARD ....................................................................................................... 11

ARGUMENT .................................................................................................................... 11

   I. PSD Violations Are Ongoing. ..................................................................................... 13

     A.  PSD Permits Impose Operating Requirements. .................................................... 15

     B.  The Plant "Is Subject To" BACT on a "Continuous Basis." .................................. 18

       1.  BACT Creates an Ongoing Obligation. ....................................................... 18

       2.  Permitting and BACT Violations Are Recurring Every Day. ...................... 19

       3.  EPA's Interpretation of PSD Is Entitled to Deference. ............................... 19

     C.  Case Law Demonstrates that "By Its Own Terms," PSD Creates Ongoing Obligations.20

     D.  The Purpose of the Act Would be Frustrated if PSD Violations are found to be Non-Recurring. ................................................................................................. 25

   II. If the Court Finds that PSD Violations are Not Ongoing, Penalties are Still Not Barred. .. 26

     A.  "The Relevant Date for Consideration of the Statute of Limitations Is the Completion of Construction." ............................................................................... 27

     B.  Defendants Stretched Construction of the Project Over Five Years "To Avoid PSD Review." ............................................................................................... 28

     C.  Perverse Incentives Result from a Finding that PSD Violations Vanish the Day After Construction Begins. ........................................................................... 31

   III. Material Issues of Fact Exist Because the 2007 Changes Were Made Within the Statutory Period. .......................................................................................................... 32

CONCLUSION ................................................................................................................. 33

## Table of Authorities

**Federal Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) .......................................................... 11

*Citizens Against Ruining the Environment v. EPA*, 535 F.3d 670 (7th Cir. 2008) ........................ 13

*Dep't of Envt'l Conservation v. EPA*, 540 U.S. 461 (2004) .......................................................... 20

*Haavistola v. Community Fire Co. of Rising Sun, Inc.*, 6 F.3d 211 (4th Cir. 1993).................... 11

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ................................................................ 17

*Kaw Valley Elec. Co-op. v. Kan. Elec. Power Co-op.*, 872 F.2d 931(10th Cir. 1989)................ 17

*Nat'l Parks Cons. Ass'n Inc. v. TVA*, 480 F.3d 410 (6th Cir. 2007).................................. 4, 19, 21

*Nat'l Parks Conservation Ass'n v. TVA*, 502 F.3d 1316 (11th Cir. 2007)............................. 4, 22

*New York v. EPA*, 413 F.3d 3 (D.C. Cir. 2005) ............................................................................... 2

*New York v. Niagara Mohawk*, 263 F. Supp. 2d 650 (W.D.N.Y. 2003) ....................................... 25

*Pulliam Inv. Co., Inc. v. Cameo Properties*, 810 F.2d 1282 (4th Cir. 1987)............................... 11

*Sierra Club v. Dairyland Power Cooperative*, 2010 WL 4294622 (W.D. Wis. 2010) ........ passim

*Sierra Club v. Otter Tail Power Co*, 615 F.3d 1008 (8th Cir. 2010)..................................... 22, 24

*Tiberi v. Cigna Corp.*, 89 F.3d 1423 (10th Cir. 1996)................................................................. 17

*United States v. Cemex, Inc.*, 2012 WL 1079107 (D. Colo. Mar. 30, 2012) ............................... 17

*United States v. Cinergy Corp.*, 458 F.3d 705 (7th Cir. 2006) .................................................... 25

*United States v. Duke Energy Corp.*, 278 F. Supp. 2d 619 (M.D.N.C. 2003), *rev'd on other
    grounds, Envt'l Defense, et al. v. Duke Energy Corp.*, 127 S. Ct. 1423............................ 13, 21

*United States v. East Ky. Power Coop., Inc.*, 498 F. Supp. 2d 1010 (E.D. Ky. 2007) .................. 4

*United States v. Ill. Power Co.*, 245 F. Supp 2d 951 (S.D. Ill. 2003)........................................... 27

*United States v. Marine Shale Processors*, 81 F.3d 1329 (5th Cir. 1996)...................... 16, 17, 22

*United States v. Murphy Oil*, 143 Supp.2d 1054 (W.D. Wis. 2001)............................................ 23

*United States v. Questar Mgmt. Co.*, No. 2:08-cv-00167-TS, 2011 WL 1793239 (D. Utah May,
    11, 2011) .............................................................................................................................. 27

*United States v. S. Ind. Gas & Elec. Co.*, No IP 99-1692-C-M/F, 2003 WL 1767052 (S.D. Ind.
    Feb. 18, 2003) ...................................................................................................................... 27

*United States v. Smithfield Foods, Inc.*, 191 F. 3d 516 (4th Cir. 1999)...................................... 26

*United States v. Westvaco*, 144 F. Supp.2d 439 (D. Md. 2001) ...................................... 20, 23, 27

*United States v. Wildes*, 120 F.3d 468 (4th Cir. 1997) ................................................................ 24

**Statutes**

28 U.S.C. § 2461 ............................................................................................................................ 4

28 U.S.C. § 2462 ....................................................................................................................... 4, 12

31 U.S.C. § 3701 ............................................................................................................................ 4

42 U.S.C. § 7401 ............................................................................................................................ 1

42 U.S.C. § 7401(b)(1) ................................................................................................................... 1

42 U.S.C. § 7410(j) ...................................................................................................................... 24

42 U.S.C. § 7411(a)(4)................................................................................................................ 2, 13

42 U.S.C. § 7413(a) ....................................................................................................................... 4

42 U.S.C. § 7413(b) .................................................................................................. 4, 22
42 U.S.C. § 7413(e) ....................................................................................................... 26
42 U.S.C. § 7470(1) & (3). ............................................................................................. 2
42 U.S.C. § 7475(a) ................................................................................................ passim
42 U.S.C. § 7475(a)(1) ........................................................................................ 2, 13, 18
42 U.S.C. § 7475(a)(3) ................................................................................................... 24
42 U.S.C. § 7475(a)(4) ..................................................................................... 2, 14, 18, 24
42 U.S.C. § 7479(2)(C) ................................................................................................... 2
42 U.S.C. § 7479(3) ....................................................................................................... 13
42 U.S.C. § 7602(k) ....................................................................................................... 13
42 U.S.C. § 7661 ............................................................................................................ 16
42 U.S.C. §§ 7410(a)(2)(D) and (K) ............................................................................... 3
42 U.S.C. §§ 7470-7479 .................................................................................................. 2
42 U.S.C. §§ 7661a(b)(1) & (d) ...................................................................................... 3
42 U.S.C. §7413 .............................................................................................................. 3
42 U.S.C. § 7475(a)(7) ................................................................................................... 24
42 U.S.C. § 7479(3) ....................................................................................................... 24
42 U.S.C. § 7602(k) ....................................................................................................... 24
42 U.S.C. § 7661c(a) ....................................................................................................... 3

## Regulations

40 C.F.R. § 50.4 .............................................................................................................. 2
40 C.F.R. § 50.5 .............................................................................................................. 2
40 C.F.R. § 51.166(a)(6) ................................................................................................. 3
40 C.F.R. § 52.21(b)(2)(i) ............................................................................................... 2
40 C.F.R. § 52.21(b)(3)(i) ............................................................................................... 2
40 C.F.R. § 52.21(i)(2) .................................................................................................... 2
40 C.F.R. § 52.21(j)(1), (3) ............................................................................................ 24
40 C.F.R. § 52.21(j)(3) ........................................................................................ 3, 18, 21
40 C.F.R. § 52.21(r)(1) ........................................................................................ 3, 14, 15
40 C.F.R. § 70.1(b) .......................................................................................................... 4
40 C.F.R. § 70.2 ........................................................................................................... 3, 4
40 C.F.R. § 70.5(a), (b) & (d) ......................................................................................... 4
40 C.F.R. § 70.7(b)(2) ..................................................................................................... 3
40 C.F.R. § 81.321 .......................................................................................................... 2
COMAR 26.11.02.04 ....................................................................................................... 8
COMAR 26.11.03.01(A) .................................................................................................. 3
COMAR 26.11.03.01(C) .................................................................................................. 3
COMAR 26.11.03.01(E) & (F) ........................................................................................ 4
COMAR 26.11.03.02(C) .................................................................................................. 3
COMAR 26.11.03.03 ........................................................................................................ 3
COMAR 26.11.06.14 ......................................................................................... 3, 14, 15, 22

## Rules

Fed .R.Civ.P. 56(a) ........................................................................................................ 11

**Other Authorities**

45 Fed. Reg. 52,676 (Aug. 7, 1980)............................................................................... 24
46 Fed. Reg. 32,071 (July 19, 1981)............................................................................... 19
47 Fed. Reg. 42,154 (Sept. 24, 1982).............................................................................. 19
67 Fed. Reg. 36,810 (May 28, 2002) ................................................................................ 3
57 Fed. Reg. 32,314 (July 21, 1992)............................................................................... 15
Guidance on the Appropriate Injunctive Relief for Violations of Major New Source Review
    Requirements, Eric Schaeffer, Director, Office of Regulatory Enforcement (Nov. 17, 1998)  30
*In re Genesee Power Station Ltd. Partnership*, 4 E.A.D. 832, 1993 WL 484880, at *13 (E.A.B.
    Oct. 22, 1993) .......................................................................................................... 19
*In re Steel Dynamics, Inc.*, 9 E.A.D. 165, 2000 WL 833062, at *31-33 (E.A.B. June 22, 2000)  19
United States' Memorandum in Opposition to Questar's Motion for Partial Summary Judgment.
    2:08-cv-00167-DAK-SA, Dkt. 316 at 21 (Nov. 5, 2010) ....................................... 28

## INTRODUCTION

The United States brought this action under the Prevention of Significant Deterioration

("PSD") provisions of the Clean Air Act (the "Act" or "CAA"), 42 U.S.C. § 7401, *et seq*.,

regarding violations at the Holcim portland cement plant ("Plant") in Hagerstown, Maryland.

Defendants Holcim (US) Inc. ("Holcim") and St. Lawrence Cement Company, LLC ("St.

Lawrence") (collectively "Defendants") undertook a series of construction activities at the Plant

ostensibly as part of a tire-derived fuel project ("TDF Project" or "Project") to burn whole tires

as a fuel in the Plant's kiln.  Despite evidence available before the Project that it could greatly

raise emissions of the pollutant sulfur dioxide ("$SO_2$"), Defendants failed to obtain a required

PSD permit and operate according to its limits.  As a result, for nine years and counting, the

Project has resulted in thousands of tons of illegal emissions of $SO_2$ into the air.

Defendants filed a Motion for Partial Summary Judgment requesting that the Court hold

that the statute of limitations for civil penalties has run on the claims that Defendants failed to

obtain a PSD permit for the Project and continue to fail to operate the Plant in accordance with

applicable emission limits.  (Docket 37-1.)  The Motion should be denied because PSD

violations are ongoing as a matter of law; the five-year statute of limitations has not run on the

claims associated with the Project because it stretched into 2008; and material issues of fact exist

as to whether the parts of the Project constructed in 2007 violated PSD independently of earlier

phases of the Project.

## STATUTORY AND REGULATORY BACKGROUND

The CAA was enacted in 1970 "to protect and enhance the quality of the Nation's air

resources so as to promote the public health and welfare and the productive capacity of its

population."  42 U.S.C. § 7401(b)(1).  The CAA establishes various programs to achieve this

goal, including the New Source Review ("NSR") program, which addresses the impact on air

quality from newly constructed or modified sources of air pollution. *New York v. EPA*, 413 F.3d

3, 10 (D.C. Cir. 2005). The NSR program includes the PSD program, 42 U.S.C. §§ 7470-7479,

which exists to prevent air quality deterioration in areas where ambient air quality meets

regulatory standards (i.e., "attainment areas"). 42 U.S.C. § 7470(1) & (3).[1]

The heart of the PSD program is the requirement that "[n]o major emitting facility" may

be constructed or modified[2] in attainment areas unless certain obligations are met. 42 U.S.C. §

7475(a). Among these requirements, the facility must obtain a PSD permit, prior to construction

or modification, that "set[s] forth emission limitations for such facility," 42 U.S.C. § 7475(a)(1),

and the facility must be "subject to the best available control technology [("BACT")] for each

pollutant subject to regulation … emitted from, or which results from, such facility." 42 U.S.C.

§ 7475(a)(4). The PSD requirements apply to a "modification" if it is "major," 40 C.F.R. §

52.21(i)(2) (2000)[3], i.e., a modification "that would result in a significant net emissions increase

of any pollutant subject to regulation under the Act." 40 C.F.R. § 52.21(b)(2)(i). For $SO_2$, a

"significant" net emissions increase is an increase in the rate of $SO_2$ emissions that would equal

or exceed 40 tons per year. 40 C.F.R. § 52.21(b)(3)(i). While PSD permits are often referred to

as "pre-construction permits," the requirements set forth in 42 U.S.C. § 7475(a)(1) and (a)(4)

---

[1] EPA has promulgated a national ambient air quality standard ("NAAQS") for $SO_2$. 40 C.F.R. § 50.4, 50.5. The Plant is located in Washington County, which is classified as attainment or unclassifiable for $SO_2$, meaning that the area meets the NAAQS. 40 C.F.R. § 81.321.

[2] While 42 U.S.C. § 7475(a) states only that "[n]o major emitting facility may be *constructed* in any area to which this part applies unless" (emphasis added) a permit has been issued and the facility is subject to BACT, among other things, the CAA defines "construction" in this context to include "modification." 42 U.S.C. § 7479(2)(C). "Modification," in turn, is defined as "any physical change in or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted." 42 U.S.C. § 7411(a)(4).

[3] All references to 40 C.F.R. § 52.21 in this brief refer to the 2000 edition (Ex. 18).

make clear that Congress intended for PSD permits to govern both construction and *operation* of new and modified sources.

States implement PSD through a State Implementation Plan or "SIP." SIP provisions must meet federal standards, are subject to review and approval by EPA, and are federally enforceable once approved. 42 U.S.C. §§ 7410(a)(2)(D) and (K), 7413, 7471; 40 C.F.R. § 51.166(a)(6).

In 2002, EPA approved a revision to the Maryland SIP that enabled the Maryland Department of the Environment ("MDE") to administer the PSD program. 67 Fed. Reg. 36,810 (May 28, 2002). Under Maryland's PSD program in effect at the time of the violations here, a person may not "construct, modify, or operate, or cause to be constructed, modified or operated," a PSD source that will result in violation of "any provision" of the federal PSD regulations, 2000 edition. COMAR 26.11.06.14 (2002).[4] The federal PSD regulations likewise prohibit construction of a major modification without a PSD permit, 40 C.F.R. § 52.21(r)(1), and require that a major modification "shall apply" BACT, 40 C.F.R. § 52.21(j)(3).

In 1990, well after enacting the CAA's PSD provisions, Congress promulgated Title V of the CAA. Title V requires certain air pollution sources to obtain Title V operating permits that include all of the CAA requirements that apply to that source, including PSD requirements. 42 U.S.C. §§ 7661a(b)(1) & (d), 7661c(a); 40 C.F.R. § 70.2; COMAR 26.11.03.01(A), .02(C), .03. It is unlawful for a person to operate a source subject to Title V in non-compliance with any applicable requirements. 40 C.F.R. § 70.7(b)(2); COMAR 26.11.03.01(C).

Under Title V, all applicable CAA requirements must be timely identified and included in the Title V permit. Additionally, facility officials must certify the accuracy and completeness of the information contained in the permit application, and supplement it upon becoming aware of

---

[4] All references to COMAR in this brief refer to the 2002 edition (Ex. 3).

relevant facts or incorrect information.  40 C.F.R. §§ 70.5(a), (b) & (d); COMAR 26.11.03.01(E)

& (F).  These provisions place the burden on the source to identify all applicable requirements.

*United States v. East Ky. Power Coop., Inc.*, 498 F. Supp. 2d 1010, 1012 (E.D. Ky. 2007).  Title

V generally "does not impose substantive new requirements," 40 C.F.R. §70.1(b); rather, it is a

framework permit, consolidating pre-existing requirements, such as those from the PSD

program, into a single document to facilitate compliance.  40 C.F.R. §§ 70.1(b), 70.2.

 EPA may bring a civil action in accordance with 42 U.S.C. § 7413(b), whenever it finds

that any person has violated or is in violation of any PSD requirements, PSD provisions of the

Maryland SIP, or Title V.  42 U.S.C. § 7413(a).  In such action, the CAA authorizes EPA to seek

injunctive relief and/or a civil penalty of up to $25,000 per day for each violation.  42 U.S.C. §

7413(b).[5]  The Act does not include a specific statute of limitations.  Instead, courts have applied

the general five-year statute of limitations set forth in 28 U.S.C. § 2462 to civil penalty claims

brought pursuant to the Act.  *See Nat'l Parks Cons. Ass'n Inc. v. TVA*,[6] 480 F.3d 410, 415 (6th

Cir. 2007) ("*National Parks II*").

## STATEMENT OF FACTS

 The Project began in 2003 and was stretched over five years in a series of physical

changes to the kiln system,[7] some of which did not begin until 2007.  The result is "significant"

---

[5] Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701, EPA can seek a civil penalty of up to $25,000 per day for each violation occurring on or before January 30, 1997; up to $27,500 per day for each violation occurring on or after January 31, 1997, and up to and including March 15, 2004; up to $32,500 per day for each violation occurring on or after March 16, 2004, and up to and including January 12, 2009; and up to $37,500 per day for violations occurring on or after January 13, 2009.

[6] Note that two decisions relevant to this matter share this same title; one is a Sixth Circuit decision, *National Parks II*, and the other is an Eleventh Circuit decision, *Nat'l Parks Conservation Ass'n v. TVA*, 502 F.3d 1316, 1325-26 (11th Cir. 2007) ("*National Parks I*").

[7] The kiln system is the focal point of the Plant.  Raw materials are fed into the back of the kiln – a horizontally sloped rotary cylinder – and heated.  The raw materials are moved to the front of the kiln and

increases of $SO_2$ emissions – by more than 800 tons in one year alone – that continue today.   The

life of the Project progressed in two phases: (1) changes made to the kiln from 2003 to 2005 to

install and operate a system to feed whole tires to the middle of the kiln as fuel; and (2) changes

made to the kiln system between 2006 and 2008 – installation of mixing air technology, a new

ID fan, and a new burner pipe  – following the Plant's Manufacturing Performance Review

("MPR").   The purpose of the MPR was to "increase cement production" and "to lower

manufacturing costs."   Statement of Facts ("SOF") ¶ 27.

      At the time of the Project's first phase, St. Lawrence owned the Plant.   SOF ¶ 1.   Holcim

purchased the Plant from St. Lawrence and took over its operation in 2008.   *Id.*   Prior to the

purchase, Holderbank or Holcim Group was the parent company of St. Lawrence and provided

the Plant with technical opinions and directives, including the production of the final MPR

report.   *Id.*

## A.      The NOx SIP Call.

      In 1998, EPA had requested that Maryland and other states promulgate rules to control

oxides of nitrogen ("NOx") emissions, in what was called the "NOx SIP call."   SOF ¶ 2.

Maryland's NOx rule, which EPA approved into the SIP in 2002, provided multiple compliance

options to reduce NOx emissions.   SOF ¶ 3.   One of those options that St. Lawrence considered

was the implementation of mid-kiln fuel firing.   *Id.*

      To fire fuel at mid-kiln, a hole is cut in the middle of the kiln and the fuel – whole car and

truck tires in this case – drops into the kiln.   SOF ¶ 5.   Because the fuel is introduced to the

---

dropped into a cooler.  The product is a rock-like substance – clinker – that is ground and mixed with
additives to make portland cement.  The kiln's primary heat source is coal, which is combusted in a
burner pipe in the front of the kiln.  At the back of the kiln system, an induced draft ("ID") fan pulls air
through the kiln system.  As the raw materials move from the back to the front of the kiln, the ID fan pulls
air from the front to the back.  The ID fan, along with other equipment such as mixing air technology –
which injects air into the middle of the kiln to better distribute oxygen – regulates kiln conditions.

middle of the kiln and not the burner end (or front) of the kiln, a change in kiln chemistry occurs that can reduce NOx emissions from the process. *Id.* However, this change in kiln chemistry can also increase emissions of other pollutants, like $SO_2$, if the kiln is not operated within certain parameters. *Id.* For example, uncombusted oxygen in the kiln – also known as excess oxygen or back-end oxygen, among other names – needs to be kept above a certain level to avoid an oxygen-depleted "reducing atmosphere" or "reducing condition," which can result in increased $SO_2$ emissions. SOF ¶ 6. While higher excess oxygen levels can reduce $SO_2$ emissions, they can also result in decreased production efficiency. *Id.*

**B.**     **St. Lawrence Knows that Mid-Kiln Tire Firing Could Result in $SO_2$ Emission Increases.**

Those kiln conditions that could result in $SO_2$ emissions increases – including the creation of a reducing atmosphere when firing tires at mid-kiln – were known to St. Lawrence before it chose to undertake the Project. SOF ¶ 7. As early as 1997, Holderbank, the parent company of St. Lawrence, recognized that reducing conditions needed to be avoided. *Id.* And one vendor of a mid-kiln technology with whom St. Lawrence consulted, Cadence Environmental Energy, Inc. ("Cadence"), noted that without sufficient excess oxygen in the kiln, reducing conditions would form and could result in a "sharp rise" of $SO_2$ emissions from the kiln. SOF ¶ 8. A St. Lawrence memo generally recognized that the injection of tires "may have an impact on SOx emissions."[8] SOF ¶ 9.

**C.**     **MDE Issues a State Construction Permit For Parts of the TDF Project.**

After reviewing NOx SIP Call compliance options and recognizing the potential for receipt of tipping fees – a fee tire suppliers would pay to the Plant for taking tires – and fuel savings by burning whole tires, SOF ¶ 10, St. Lawrence determined that it would move forward

---

[8] Defendants often refer to "SOx," or sulfur oxides, in their documents. The NAAQS for $SO_2$ is designed to protect against the entire group of SOx. For the purposes of this brief, SOx and $SO_2$ are equivalent.

with the Project.  SOF ¶ 11.  In May 2002, St. Lawrence submitted a state construction permit application – not a PSD permit application – to MDE for the installation of mid-kiln tire firing. *Id.*  St. Lawrence informed MDE that "the key to SOx control is the control of [excess] oxygen," *id.*, and noted that increased $SO_2$ emissions were not anticipated, but "there still could be an unforeseen increase," SOF ¶ 12.

The application identified three construction activities that St. Lawrence would undertake as part of the Project (the fact that the Project would progress in phases was not discussed in the application):  install a mid-kiln chute for the injection of tires; install mixing air technology, which is a fan that injects air into the middle of the kiln to better distribute oxygen; and upgrade the existing ID fan.  *Id.*  The mixing air and the ID fan upgrade were included as part of the application to ensure complete combustion of the tires, increase excess kiln oxygen levels, and eliminate reducing conditions in the kiln.  *Id.*  With the application, St. Lawrence included information about potential $SO_2$ emissions and mid-kiln firing from Cadence.  *Id.*

MDE issued the state construction permit in November 2002.  SOF ¶ 13.  There was no requirement to maintain certain levels of excess oxygen in the kiln.  Because the permit is not a PSD permit, it does not include any PSD requirements such as BACT obligations.

### D.      St. Lawrence Begins the First Phase of the Project.

A few months later, in January 2003, St. Lawrence began construction of the tire chute. SOF ¶ 17.  Approximately one year later, in January 2004, St. Lawrence began the upgrade of the kiln ID fan.  SOF ¶ 21.  St. Lawrence did not install the mixing air at that time, which would have required additional expenses.

**E. Sulfur Dioxide Emissions Increase and St. Lawrence Explores Ways "To Avoid PSD Review."**

Following installation of the tire chute and upgrade of the ID fan, emissions of $SO_2$ increased from 212 tons in 2003 to 530 tons in 2004.  SOF ¶¶ 20, 23.  The rise did not stop there – in 2005, St. Lawrence reported that the Plant emitted 1,388 tons of $SO_2$.  SOF ¶ 31.

Sometime after the large increases of $SO_2$ emissions began, St. Lawrence acknowledged within company documents that "[t]echnically we trigger PSD now."  SOF ¶¶ 22, 24.  The company also discussed options "to avoid PSD review."  SOF ¶ 25.  According to one document, one way to avoid review was to demonstrate to MDE that "construction of the activities authorized under the permit" was ongoing because at least one of the construction activities authorized under the permit – installation of mixing air – had not yet been implemented.  *Id.*  St. Lawrence noted that it would have to develop a plan to continue construction under the permit because as long as MDE agreed that construction under the permit was ongoing, St. Lawrence believed that it "should not be at risk" until all of the changes were completed.[9]  *Id.*  However, the damage had been done, once PSD is triggered, it cannot be avoided.

St. Lawrence met with MDE on several occasions to discuss the increases.  SOF ¶ 26.  Following those meetings, MDE authorized St. Lawrence to continue construction activities under the 2002 state construction permit – including installing mixing air.  *Id.*  MDE also authorized installation of a completely new ID fan and a new burner pipe, although these activities were not included in the original permit.  *Id.*  MDE did so with the understanding that the new ID fan and burner pipe would decrease $SO_2$ emissions.  *Id.*

---

[9] Under Maryland regulations, state construction permits expire if construction or modification is "substantially discontinued" for an 18-month period.  COMAR 26.11.02.04.

**F.      The Holcim Group Recommends Changes to Increase Production.**

Around the same time that St. Lawrence met with MDE to address the increases in $SO_2$ emissions, the Plant underwent the Manufacturing Performance Review (MPR).  SOF ¶ 27.  The MPR was conducted by Plant personnel and engineers from the Holcim Group.  *Id.*  The objective of the MPR was to increase cement production volume and lower manufacturing costs.  *Id.*  The MPR recommended some of the same changes to the kiln system that St. Lawrence had presented to MDE as steps to decrease $SO_2$ emissions as part of the TDF Project, including installing the new ID fan and burner pipe.  SOF ¶ 28.

St. Lawrence's environmental consultants expected the changes associated with the MPR to trigger PSD requirements.  *Id.*  However, there is no indication that St. Lawrence presented that information to MDE or EPA.  *Id.*

**G.      St. Lawrence Begins the Second Phase of the Project.**

In June 2006 – almost four years after the issuance of the state construction permit – St. Lawrence took the first steps to installing mixing air.  SOF ¶ 34.  The installation was stretched over almost a year, until May 2007.  SOF ¶ 37.  Plant personnel acknowledged that the location where the mixing air was to be installed – "uphill" of the tire chute, or on the side of the chute furthest from the burner end of the kiln – would result in "minimal if any" reduction in $SO_2$ emissions.  SOF ¶ 34.  However, "uphill" mixing air would allow the Plant to burn more tires.  *Id.*  St. Lawrence decided to move forward with the "uphill" location of the mixing air even if it could mean "an increased $SO_2$ level."  *Id.*

Around this time, the Plant manager ran emissions tests to determine the relationship between clinker production rates and $SO_2$ emissions.  SOF ¶ 32.  The Plant manager concluded that a "5-6% reduction in production produces a 75% reduction in SOx" emissions.  *Id.*

9

Following the test, $SO_2$ emissions did not decrease by 75%: in 2006, $SO_2$ emissions from the Plant were 1,146 tons per year, SOF ¶ 35, and increased to 1,209 TPY in 2007, SOF ¶ 40.

In April 2007, St. Lawrence moved forward with the second phase of the Project: it replaced the ID fan that it had previously upgraded and installed a new burner pipe. SOF ¶¶ 36, 38. Those changes cost almost $2,000,000. *Id.* Also in 2007, St. Lawrence conducted another test: it raised the excess kiln oxygen and saw $SO_2$ emissions drop "down to practically zero." SOF ¶ 39. After this test, $SO_2$ emissions remained elevated, and in 2008, Holcim relocated the tire chute in an effort to reduce emissions. SOF ¶ 41. The Plant emitted 865 tons of $SO_2$ in 2008, SOF ¶ 42, over 600 tons more of the pollutant than it emitted in the year before the Project began.

**H.      EPA Issues a Notice of Violation and Holcim Submits a PSD Permit Application.**

EPA inspected the Plant in December 2007 and issued the first Notice of Violation for PSD violations in June 2008. SOF ¶ 43. A few months later, in October 2008, Holcim – who at the time had taken over operation of the Plant – submitted a PSD permit application to MDE. SOF ¶ 44. Holcim sought a PSD permit and BACT determination for what the company called the "several phases of modifications." *Id.* The BACT pollution control obligation proposed in the application, "inherent dry scrubbing," required no physical or operational changes to the kiln system. *Id.* MDE has not issued a PSD permit for the Project.

The Parties entered an agreement tolling the United States' claims for CAA violations at the Plant commencing on October 22, 2008 through April 29, 2011, and agreed that that period shall not be included in the computing of any statute of limitations potentially applicable to this action. SOF ¶ 45. The United States filed the Complaint on April 28, 2011. SOF ¶ 46.

## **LEGAL STANDARD**

Summary judgment is only proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  As the moving party, Defendants "carr[y] the burden of showing that there is no genuine issue as to any material fact in the case."  *Pulliam Inv. Co., Inc. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987) (internal citations omitted).  A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  When determining whether such a genuine issue of material fact exists, courts "must draw all permissible inferences from the underlying facts in the light most favorable to the party opposing the motion."  *Haavistola v. Community Fire Co. of Rising Sun, Inc.*, 6 F.3d 211, 214 (4th Cir. 1993).

## **ARGUMENT**

Defendants' unlawful activity did not begin on the first day of construction in January 2003 and then vanish a day later.  Defendants were and are obligated to obtain a PSD permit and are required to operate the Plant according to that permit and with BACT.  If penalties are barred, Defendants are rewarded for stretching out the Project; hiding from PSD requirements under the cover of a state construction permit; and making changes to the Plant that resulted in enormous increases of $SO_2$ emissions.  If Defendants are successful in the Motion, they will have avoided any penalties for circumventing PSD obligations.  This perverse incentive should be stopped and the Motion should be denied for the following three reasons.

*First*, the PSD violations are ongoing and occur every day that the Plant operates without a PSD permit and BACT.  The structure of the Act, the federal PSD regulations, and Maryland's SIP require such a finding.  The Court should adopt the reasoning of the Sixth Circuit and other courts that say PSD obligations, by their own terms, are ongoing.  And the Court should decline to follow cases that generalize the PSD program as prescribing only preconstruction requirements that evaporate after the first day of construction.  As a matter of law, the statute of limitations has not run on these ongoing violations, and Defendants' Motion should be denied.

*Second*, even if the court does not find that PSD obligations are ongoing, the PSD violations continued at least until Project construction ended.  The United States filed the Complaint within five years of the completed construction, and therefore, as a matter of law, the statute of limitations has not run, and Defendants' Motion should be denied.

*Third*, there are genuine issues of fact as to whether the changes made in 2007 (the new ID fan and burner pipe) independently triggered PSD requirements.  Those 2007 changes alone – made to increase clinker production and costing millions of dollars – may have significantly increased potential $SO_2$ emissions and violated PSD, independent of the construction activities that began in 2003.  The United States filed the Complaint within five years of the start of construction of the 2007 changes, and civil penalties associated with those claims should survive this Motion.

Defendants note that the motion does not address the Second Claim for Relief in the Complaint (Dkt. 1) – violations of Title V of the Act – because those claims "arguably are continuing violations because they concern the ongoing operation of the Plant."  (Dkt. 37-1 at 2.) The Title V claims, which are separate from the PSD claims, should be decided on their own merits and should not be considered with the current motion.

The Parties agree that this Motion does not address the United States' claims for injunctive relief.  (*Id.*)  Numerous courts have held that 28 U.S.C. § 2462 applies only to claims for civil penalties, not injunctive relief.  *See United States v. Duke Energy Corp.*, 278 F. Supp. 2d 619, 653 (M.D.N.C. 2003) ("*Duke Energy*"), *rev'd on other grounds*, *Envt'l Defense, et al. v. Duke Energy Corp.*, 127 S. Ct. 1423 (2007).

I.      PSD VIOLATIONS ARE ONGOING.

Holcim is violating the Act each day that it operates without a PSD permit and without PSD pollution control obligations.  As a result, each day Holcim emits excess pollution constitutes an independent violation with its own limitations clock for civil penalty relief.

Section 165(a) of the Act requires that a PSD permit must set forth "emission limitations" identified by the reviewing authority based on emissions reductions achievable with the "best available control technology" (BACT).  42 U.S.C. § 7475(a)(1), (4).  The Act defines BACT as an "emission limitation based on the maximum degree of reduction of each pollutant" emitted from a facility.  42 U.S.C. § 7479(3).  An "emission limitation" is defined, in turn, as a "requirement * * * which limits the quantity, rate, or concentration of emissions of air pollutants *on a continuous basis*, including any requirement relating to the operation or maintenance of a source to assure *continuous* emission reduction."  42 U.S.C. § 7602(k) (emphases added).

The word "continuous" demonstrates that compliance with BACT is an ongoing duty that does not apply (and end) only at the time of construction.  To meet the BACT requirement, a facility must both install and – more importantly – operate the required control technology.  *Id.*; *see Citizens Against Ruining the Environment v. EPA*, 535 F.3d 670, 673 n.3 (7th Cir. 2008) ("*CARE*") (no source may be modified "unless a permit *prescribing emission limitations* has

been issued") (emphasis added).  Thus, although PSD permits may be issued prior to construction, ongoing BACT obligations plainly govern a source's operation post-construction.

In characterizing the PSD provisions as one-time obligations to be fulfilled before construction, Defendants simplify PSD so far as to render it pointless.  While Section 165 compels various "preconstruction requirements" on a facility undertaking a major modification, the reference to preconstruction does not limit PSD obligations to construction alone.  A prime example, discussed below (*infra* at 18), is Section 165(a)(4), 42 U.S.C. § 7475(a) (4), which creates an ongoing obligation to apply BACT pollution controls as long as a facility operates. *See Sierra Club v. Dairyland Power Cooperative*, 2010 WL 4294622, at *10 (W.D. Wis. 2010) ("*Dairyland*").

Defendants also omit key provisions of Maryland's SIP and the PSD regulations that speak to those ongoing obligations.  (Dkt. 37-1 at 14.)  First, Defendants fail to cite to the SIP itself, namely, that a person "may not construct, modify, or *operate*" a facility "which will result in violation of *any* provision of 40 C.F.R. § 52.21, 2000 edition…."  COMAR 26.11.06.14 (emphasis added).  Instead, Defendants skip the SIP language altogether.  (*See* Dkt. 37-1 at 14.)  Additionally, in their review of the federal PSD regulations, Defendants omit the word "operates" in the PSD enforcement provision that "any owner or operator who constructs *or operates* a source" not in accordance with a PSD permit is subject to an enforcement action, 40 C.F.R. 52.21(r)(1).  (*See* Dkt. 37-1 at 14.)

These provisions are critical to the examination of the PSD obligations in the federal regulations and the Maryland SIP.  Regardless of any attempt to disguise those obligations, the language of the Act plainly shows that violations of the PSD program may *begin* when construction starts, but they do not *end* there.

14

A.      **PSD Permits Impose Operating Requirements.**

PSD specifies obligations that must be, and can only be, implemented once a source begins polluting.  And a plant cannot pollute unless it is operating.  So, to find that PSD can only be violated on the first day of construction – and no other time thereafter (i.e., during plant operation) – makes no sense and is contrary to the Maryland SIP.

Since PSD permits contain important operating requirements, Defendants can be required to obtain a PSD permit even after the modification ends.  If the Plant recognizes that it should have received a PSD permit, then it must acquire one even though the Project is already finished.  *See* 57 Fed. Reg. 32,314, 32,325 (July 21, 1992) ("the source would *become subject* to [PSD] requirements at that time") (Ex. 19).  Defendants must concede this point, given that Holcim applied for a PSD permit in October 2008, even though the changes to the kiln were complete at that time.  If PSD permits were simply "preconstruction" permits, there would be no point to Holcim applying for a permit after construction is complete.

Further, consider the perverse incentives created if PSD permits are not found to have operating requirements.  Imagine two identical facilities that plan identical modifications, each of which knows these modifications may result in significant net increases of $SO_2$.  On the one hand, Facility A complies with the law and obtains a PSD permit prior to construction, which includes BACT obligations.  Facility A spends hundreds of thousands of dollars to install pollution control technologies to comply with BACT.  If, after modification, Facility A operates in non-compliance with the BACT emission limits set forth in its permit, it is subject to enforcement action and civil penalties.  40 C.F.R. § 52.21(r)(1).  On the other hand, Facility B breaks the law, does not obtain a PSD permit prior to construction, and spends no resources to comply with BACT.  If PSD is found to not have operating requirements, then Facility B would

have a free pass to pollute without penalty once the statute of limitations runs, a pass it received *by breaking the law* and not obtaining a PSD permit in the first place.  This is tantamount to holding that drivers cannot be fined for speeding if they do not first obtain a driver's license.

If penalties are barred here, Defendants would be rewarded for misrepresenting to MDE the potential for $SO_2$ emissions increases as a result of the Project, stretching out construction activities until five years passed, and never taking actions – like installing pollution controls or sufficiently raising excess kiln oxygen – to reduce $SO_2$ emissions.  Following Defendants' interpretation of the law on this point ignores a key purpose of a PSD permit – to set BACT – and would encourage facilities to modify without that permit.  Such a scheme would result in considerable unfairness to those facilities that do comply with the law.

To demonstrate their theory that PSD violations vanish the day after construction begins, Defendants refer to the existence of the Act's Title V "operating permit" program, 42 U.S.C. § 7661.  The fact that Title V is an operating permit program does not preclude PSD permits from "include[ing] limits on a source's operations," *see United States v. Marine Shale Processors*, 81 F.3d 1329, 1355-1356 (5th Cir. 1996) ("*Marine Shale*").  In fact, Title V permits do "not impose new obligations." *Dairyland*, 2010 WL 4294622, at *13.  Instead, Title V permits are *framework* permits that consolidate "pre-existing requirements," like those from the PSD program, into a single document.  *See id.*  As a result, the mere existence of Title V is "irrelevant" to the analysis here and does "not mean that PSD program must lack operational requirements."  *Id.*

The history of the Title V program reinforces this point.  Thirteen years after creating the PSD permitting program, Congress enacted Title V, which requires facilities to have a Title V permit *in addition to* the other permits the Act requires.  But the Title V permit program does not repeal or supersede the PSD permit program; to the contrary, Congress specifically instructed

16

that "nothing [in the new Title V program] shall be construed to alter" existing PSD permitting requirements.[10] 42 U.S.C. § 7661a(a); *see generally Marine Shale*, 81 F.3d at 1355-1356 (noting "confusion" that results from co-existence of NSR "preconstruction" and Title V "operating" permits).

Because issuance of PSD permits protects human health and the environment, a company that refuses to obtain a permit for a modified facility injures the public on an ongoing basis.  That injury gives rise to an ongoing violation that continues until the company obtains a permit or stops operating the facility. *See Dairyland*, 2010 WL 4294622 at * 14 ("because a PSD permit imposes ongoing operational requirements that may be violated after construction is complete, a major source has an obligation to obtain a permit even after its construction is complete.").

In such situations, there is no "staleness concern" for a statute of limitations to police. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380 (1982).  Rather, each day a facility runs without a PSD permit and without BACT constitutes an affirmative and "independent act" that results in a "new and accumulating" injury to the public.  *See Kaw Valley Elec. Co-op. v. Kan. Elec. Power Co-op.*, 872 F.2d 931, 933 (10th Cir. 1989) (describing the "continuing violation" requirements); *see also United States v. Cemex, Inc.*, 2012 WL 1079107, at *6 (D. Colo. Mar. 30, 2012) ("Given that the CAA is a statute intended to prevent emission of air pollution, the continued emission of pollutants that would otherwise be limited had the source complied with the PSD . . .  program[] could be considered a repeated injury" under Tenth Circuit continuing violation precedent set forth in *Tiberi v. Cigna Corp.*, 89 F.3d 1423, 1430-31 (10th Cir. 1996)).

---

[10] The operating provisions of PSD permits are independently enforceable even though the Act also requires modified facilities to have a Title V permit. *CARE*, 535 F.3d at 679 ("It is reasonable to interpret Title V to complement, not to limit, the EPA's enforcement authority.").

**B.      The Plant "Is Subject To" BACT on a "Continuous Basis."**

      1. *BACT Creates an Ongoing Obligation.*

BACT is more than just a permitting requirement.  For instance, Section 165(a)(1) – the permitting provision – is textually distinct from Section 165(a)(4) – the "is subject to" BACT provision.  42 U.S.C. § 7475(a)(1) & (a)(4).  Congress enumerated these obligations *separately* because they are structurally co-equal and textually independent.  Nothing in either provision suggests that the BACT obligation is subordinate to the permitting obligation.  If anything, Section 165 suggests the opposite by stating that a PSD permit shall "set[] forth" emission limitations derived from the BACT definition, and that a facility is "subject to" BACT at the time of modification – not when a PSD permit issues.

The Act's use of the present tense in prescribing the use of BACT is also instructive.  Section 165(a)(4) of the Act says that no new or modified plant may be constructed unless it "is subject to" BACT.  42 U.S.C. § 7475(a)(4).  This language can only mean one thing: the modified Plant *is subject to* BACT on an ongoing basis (even if a PSD permit is not issued) – not that the Plant "will be" subject to BACT if and when a permit is issued.

The Sixth Circuit agrees with this reading of the Act.  In *National Parks II*, 480 F.3d at 418, the Sixth Circuit determined that "by its own terms [Section 165(a)(4)] creates an ongoing obligation to apply BACT" to a new or modified source even if a permit is not obtained.  *See also, Dairyland*, 2010 WL 4294622, at *5.  EPA regulations say the same thing.  They instruct that a modified facility "shall apply" BACT, without mentioning PSD permitting procedures at all.  40 C.F.R. § 52.21(j)(3).

Section 165(a)(4) applies to *all* modified facilities, not just facilities that have PSD permits.  42 U.S.C. § 7475(a)(4).  A facility can violate BACT even if it does *not* have a PSD

18

permit.  Put another way, the obligation to apply BACT is triggered by modification of the Plant – not just issuance of a PSD permit.  *See Dairyland*, 2010 WL 4294622, at  *5.

### 2. *Permitting and BACT Violations Are Recurring Every Day.*

Emitting excess pollution from the Plant "manifests itself anew each day a plant operates without BACT limits on emissions."  *National Parks II*, 480 F.3d at 419.  Each day is a new cause of action that comes with its own five-year limitations clock.

Consistent with the statute and regulations, EPA has, since the earliest days of the PSD program, taken the position that PSD requires BACT operating limits to be met on a continual basis and has issued PSD permits that impose ongoing requirements.  *E.g.*, Issuance of PSD Permit to Rockwell Int'l, 46 Fed. Reg. 32,071-072 (July 19, 1981) (explaining that BACT for engine testing facility constrains facility's "operating parameters") (Ex. 20); Issuance of PSD Permit to Merck & Co., 47 Fed. Reg. 42,154 (Sept. 24, 1982) (BACT requirements "include proper operation and design of the turbines") (Ex. 21).  Indeed, EPA's Environmental Appeals Board has remanded PSD permits that failed to impose continuous BACT limits on post-construction operations.  *See In re Steel Dynamics, Inc.*, 9 E.A.D. 165, 2000 WL 833062, at *31-33 (E.A.B. June 22, 2000) ("BACT limits must be established to ensure compliance on a continuous basis at all levels of operation") (Ex. 22); *In re Genesee Power Station Ltd. Partnership*, 4 E.A.D. 832, 1993 WL 484880, at *13 (E.A.B. Oct. 22, 1993) (permit must specify numerical limits) (Ex. 23).  Otherwise, the BACT obligation and the language of the Act would be superfluous.

### 3. *EPA's Interpretation of PSD Is Entitled to Deference.*

EPA's interpretation of the Act is reasonable and entitled to deference.  As the Supreme Court explained in deferring to EPA's interpretation of another issue arising from the definition

of BACT:  "We normally accord particular deference to an agency interpretation of longstanding duration, * * * recognizing that 'well-reasoned views of an expert administrator rest on a body of experience and informed judgment to which courts and litigants may properly resort for guidance."  *Alaska Dep't of Envt'l Conservation v. EPA*, 540 U.S. 461, 487 (2004) (citations and internal quotation marks omitted).

### C.     Case Law Demonstrates that "By Its Own Terms," PSD Creates Ongoing Obligations.

The courts that find PSD obligations to be ongoing focus on the construction and operation requirements of PSD and SIPs because "these provisions illuminate the true nature of the PSD program's ongoing emissions controls."  *Dairyland*, 2010 WL 4294622, at *12. Defendants all but ignore the significant decisions from a number of courts – including the Sixth Circuit in *National Parks II* and the Fifth Circuit in *Marine Shale* – who have agreed with EPA's position that PSD violations are ongoing.[11]

Instead, Defendants urge the Court to adopt the reasoning of cases holding that failure to comply with PSD is a one-time violation – including one case decided more than 10 years ago by this Court, *United States v. Westvaco Corp.*, 144 F.Supp.2d 439 (D. Md., 2001) ("*Westvaco*"). Based on a careful examination of the CAA and Maryland's SIP, those cases were wrongly decided and this Court should decline to follow *Westvaco*.  While the Fourth Circuit has not ruled on this issue, a district court in the Fourth Circuit supports the United States' position.  *See*

---

[11] In addition to *National Parks II* and *Marine Shale*, the following district court decisions support the United States' position: *Dairyland* , 2010 WL 4294622, Oct. 22, 2010 (W.D.Wis.), *overruling United States v. Murphy Oil,* 143 Supp.2d 1054, 1083-84 (W.D. Wis. 2001) ("*Murphy Oil*"); *Sierra Club v. Portland General Elec. Co.*, 663 F.Supp.2d 983, 993 (D.Or. 2009); *United States v. CEMEX Cal. Cement LLC*, No. 07-223, *3-12 (C.D. Cal. July 10, 2007); *United States v. East Ky. Power Coop.*, 498 F. Supp. 2d 970  at 974-75 (E.D. Ky. 2007); *United States v. Ohio Edison Co.*, 2003 WL 23415140, at *5-6 (S.D. Ohio Jan. 17, 2003); and *United States v. Am. Elec. Power Serv. Corp.*, 136 F. Supp. 2d 808, 811 (S.D. Ohio 2001).

*Duke Energy*, 278 F. Supp. 2d at 652-3 ("Duke Energy's alleged failure to obtain a preconstruction permit under Section 7475 and applicable SIP provisions constitutes a continuing violation and the EPA's claims for civil penalties are therefore not barred.").

In *National Parks II*, the Sixth Circuit appropriately split its holding into two parts: (1) violations for failure to apply BACT and (2) violations for failure to obtain a PSD permit . 480 F.3d at 418-420. Both types of violations were found to be ongoing. First, the Circuit directed its analysis at a Tennessee SIP provision setting forth that "a major modification *shall apply* best available control technology for any pollutant for which it would result in a significant net emissions increase at the source." *Id*. at 418. The Circuit Court found that the provision "by its own terms" creates an ongoing obligation to apply BACT.[12] *Id*.

The Tennessee SIP provision mimics the federal PSD regulation that applies in this case, 40 C.F.R. 52.21(j)(3), almost word-for-word.[13] This Court should follow the Sixth Circuit and find that the "*shall apply*" provision creates an ongoing BACT obligation, which "manifests itself anew each day a plant operates without BACT limits on emissions." *National Parks II*, 480 F.3d at 419.

For their part, Defendants do not even address the "ongoing obligation to apply BACT" holding of *National Parks II*. *Id*. at 418. Instead, they focus only on distinguishing the second holding that failure to obtain a PSD permit likewise "manifests itself each day the plant operates." *Id*. Defendants assert that supposed differences in the PSD provisions of the Maryland and Tennessee SIPs distinguish *National Parks II* from this case because the Maryland

---

[12] The *National Parks II* court noted this Court's decision in *Westvaco*, but declined to follow its reasoning. *See id.* at 417.

[13] As noted above, the PSD regulation states, "a major modification *shall apply* best available control technology for each pollutant subject to regulation under the Act for which it would result in a significant net emissions increase at the source." 40 C.F.R. 52.21(j)(3) (2000) (emphasis added).

SIP does not explicitly include a requirement to obtain a post-construction PSD permit if an unexpected significant net increase occurs as a result of the modification.  (*See* Dkt. 37-1 at 22.)  However, since the Maryland SIP prohibits *operation* of a Plant in violation of PSD, COMAR 26.11.06.14, the difference is irrelevant here.  Both the Tennessee and Maryland SIPs impose ongoing operational requirements and both holdings in *National Parks II* are directly on point.

The Fifth Circuit's decision in *Marine Shale* is also instructive.  In that case, a facility failed to apply for minor NSR preconstruction permits and then operated the illegally modified sources.  The facility owner argued that penalty claims were barred under the relevant statute of limitations because the modifications were constructed more than five years before the action was filed – almost the same defense Defendants advocate.  The Fifth Circuit rejected this argument: "We affirm the district court's rejection of [the] statute of limitations defense to the allegations of minor source violations. …[The] argument is frivolous."  81 F.3d at 1357.  The court concluded that operation without a required NSR permit rendered subsequent emissions illegal and subjected the source to continuing "per diem" penalties for failure to obtain a permit.  *Id.*  The fact that the construction and illegal emissions began more than five years prior to the filing of the complaint was inconsequential.

Despite the opinions in *National Parks II* and *Marine Shale*, the Eleventh and Eighth Circuits disagreed with the Fifth and Sixth Circuits in *Nat'l Parks Conservation Ass'n v. TVA*, 502 F.3d 1316 (11th Cir. 2007) ("*National Parks I*") and *Sierra Club v. Otter Tail Power Co*, 615 F.3d 1008 (8th Cir. 2010) ("*Otter Tail*") decisions.  Both cases dismissed citizen suit claims on statute of limitations grounds.  Both cases were wrongly decided because the opinions are based on a misperception of the relationship between PSD and Title V.  The Eleventh and Eighth Circuits incorrectly rested their analyses on the preconstruction provisions of PSD, rather than

22

the ongoing BACT obligations, which are independent from the requirement to seek a preconstruction permit.  The cases Defendants rely on have the same erroneous underlying reasoning.

Defendants also rely on *Westvaco*, which found that Section 165(a) of the Act "clearly and unambiguously applies to the *construction* – not the *operation* – of major stationary sources."  144 F. Supp.3d at 444.  It barred recovery of civil penalties.  *Id*.  The Court did not explicitly focus on Section 165(a)(4):  the BACT requirement itself.  *Id*. at 445 n.3.  As for the Maryland SIP, which was similar to the version of the SIP at issue here, the Court noted that it "merely incorporates by reference the federal PSD regulations."  *Id*. n.4.  The Court did not address the SIP prohibition that the facility not *operate* in violation of any PSD provision.

We respectfully request that the Court decline to follow the reasoning in *Westvaco*.  Such a reexamination of these issues by a court would not be unprecedented.  In *Dairyland*, Judge Crabb concluded that her prior opinion in *United States v. Murphy Oil*, 143 F. Supp.2d 1054, 1083-84 (W.D. Wis. 2001) ("*Murphy Oil*"), finding PSD violations to be one-time only, was "decided incorrectly with respect to this issue."  Dairyland, 2010 WL 4294622, at *11.  The *Murphy Oil* decision had relied upon *Westvaco*, among other opinions.  *See Murphy Oil*, 143 F.Supp.2d at 1082.  Both decisions were issued almost a decade ago, when there was relative uniformity as to holdings on this issue.  *See Westvaco*, 144 F.Supp.2d at 443.  However, as Judge Crabb noted in *Dairyland*, and as evidenced by the current split among the Circuits and the evolution of judicial thinking on the issue, there is now a division among courts, *see Dairyland*, 2010 WL 4294622 at *11.  There are good reasons for the Court to reexamine the *Westvaco* decision and reject the holdings of cases that overlook PSD's ongoing requirements.

First, these cases say that Congress gave no "indication that the CAA imposes ongoing operational conditions under the PSD program." *See Otter Tail*, 615 F.3d at 1015.  That reasoning ignores the CAA provisions that show Congress imposed limitations on the "construction or modification *and operation*" of sources subject to PSD.  42 U.S.C. § 7410(j) (emphasis added); Section 165(a)(3) (emissions from "construction or operation" must  comply with Act); Section 165(a)(4) ("is subject to" BACT requirement); Section 169(3) (BACT defined as emission limitation); Section 165(a)(7) (authorizing post-construction air quality monitoring); Section 302(k) (emission limits continuously apply during "operation").  42 U.S.C. §§ 7475(a)(3), 7475(a)(4), 7475(a)(7), 7479(3), and 7602(k).  Defendants' interpretation inaccurately reads these operational requirements right out of the statute.  *See United States v. Wildes*, 120 F.3d 468, 470 (4th Cir. 1997) (a court must "give effect, if possible, to every clause and word of a statute") (internal citations omitted).

Second, these cases fail to give full effect to EPA's regulations, which, like the Act, not only impose the BACT requirement as a permitting prerequisite, but also require that BACT limits "shall apply" to new and modified sources, and require that modified sources "shall meet" the federal standards for new sources.  *See* 40 C.F.R. § 52.21(j)(1), (3).  When it promulgated the PSD rules, EPA said that the Act itself imposes this requirement – that PSD sources "must apply" BACT.  Requirements for Preparation, Adoption, and Submittal of Implementation Plans; Approval and Promulgation of Implementation Plans, 45 Fed. Reg. 52,676 at 52,722 (Aug. 7, 1980) (Ex. 26).  EPA even warned sources that they would be subject to an ongoing obligation to come into compliance with PSD if they improperly avoided getting a permit.  *Id.* at 52,725 (improper construction without a permit "will be considered in violation of the applicable SIP and will be retroactively reviewed under the applicable NSR regulation.").

Finally, these decisions often ignore the organizational structure of Section 165(a). Subsection (a)(1) certainly requires that a company obtain a PSD permit before starting construction, but the BACT obligation is not a mere "prerequisite" for obtaining a permit.  42 U.S.C. § 7475(a)(1), (a)(4).  *see, e.g.*, *Dairyland*, at *5 ("the individual requirements in 42 U.S.C. § 7475(a) are not subsumed by the initial requirement to obtain a preconstruction permit") (internal quotations and citations omitted).

> **D.      The Purpose of the Act Would be Frustrated if PSD Violations are Found to be Non-Recurring.**

"A remedial statute [such as the CAA] should be liberally construed to effectuate its purpose, [citation omitted] and should not be interpreted in a manner that would frustrate its goals."  *New York v. Niagara Mohawk*, 263 F. Supp. 2d 650, 663 (W.D.N.Y. 2003) (citations omitted).  Defendants' narrow interpretation of the statute, insisting that PSD violations happen only once, unquestionably frustrates the CAA's goals.

When Congress created the PSD program in 1977, most existing facilities polluted far in excess of what BACT would allow.  Instead of insisting that operators of existing facilities control their emissions right away, Congress grandfathered those facilities out of the PSD program.  But Congress expected that the grandfathered plants would eventually "wear out and be replaced by new ones that will be subject to . . . more stringent pollution controls." *United States v. Cinergy Corp.*, 458 F.3d 705, 709 (7th Cir. 2006).

The installation of these more stringent pollution controls, like BACT, can cost millions of dollars; just a BACT *analysis* can cost thousands.  But if only the first day of unpermitted construction violates the CAA, Defendants could modify the Plant without obtaining a PSD permit and would be subject to a maximum total civil penalty of $37,500.  Such a penalty is grossly inadequate to encourage PSD compliance.  Defendants would enjoy the financial benefits

of deferred expenditures by ignoring the permit requirement, waiting to be caught, and only then incurring the substantial costs of compliance, if necessary.

Environmental penalties recover the economic benefit of non-compliance, level the playing field between those who have complied with the law and those that have not, and therefore encourage compliance with the law.  *See, e.g., United States v. Smithfield Foods, Inc.*, 191 F. 3d 516, 529 (4th Cir. 1999) (affirming penalty in Clean Water Act case, holding that "economic benefit is assessed to keep violators from gaining an unfair competitive advantage by violating the law.")  The CAA specifically requires the Court to consider factors such as the economic benefit of noncompliance in assessing a penalty.  42 U.S.C. § 7413(e).  Defendants' argument that PSD violations vanish after one day renders the PSD enforcement provisions incapable of recovering the economic benefit of non-compliance, and therefore unable to encourage compliance with the law, frustrating the goals of the CAA.

II.    IF THE COURT FINDS THAT PSD VIOLATIONS ARE NOT ONGOING, PENALTIES ARE STILL NOT BARRED.

Even if the Court finds that PSD obligations are not ongoing, "the relevant date for consideration of the statute of limitations [for a violation of 42 U.S.C. § 7475(a)] is the completion of construction."  *United States v. Questar Mgmt. Co.*, No. 2:08-cv-00167-TS, 2011 WL 1793239, at *3 (D. Utah May, 11, 2011) ("*Questar*").  The purpose of the CAA is served where the completion of construction is the operable date in calculating the statute of limitations. A result otherwise is an invitation to facilities to stretch out modifications indefinitely to run out the penalties clock.

Almost all of the construction on the first phase of the Project occurred within five years of the tolling agreement, and *all* of the construction on the second phase occurred within five years of the tolling agreement.  Thus, penalties are recoverable for those days.  Specifically, the

United States filed its Complaint on April 28, 2011, and the parties entered into tolling agreements that tolled the statute of limitations from October 22, 2008 through April 29, 2011. Therefore, claims for violations that occurred after October 22, 2003 are not barred by the statute of limitations.

### A. "The Relevant Date for Consideration of the Statute of Limitations Is the Completion of Construction."

In one case where a court addressed the statute of limitations for PSD claims when construction without a PSD permit began outside of the statute of limitations period, but then continued into and was completed within the limitations period, the court held that "the relevant date for consideration of the statute of limitations [for a violation of 42 U.S.C. § 7475(a)] is the completion of construction." *Id.* ("*Questar*"). Similarly, this Court in *Westvaco* noted that a violation for failure to obtain a construction permit "does not continue past the completion of construction," *Westvaco*, 144 F. Supp. 2d at 444, indicating that the violation lasts until the construction end date.[14]

Defendants ask the Court to overlook the "confusing" language in *Westvaco* that is unfavorable to them. (Dkt. 37-1 at 24.) Then, they give passing reference to the *Questar* decision, urging the Court to ignore the case that is most analogous to this one. Here and in *Questar*, construction began more than five years prior to the filing of a complaint or the signing

---

[14] The *Questar* and *Westvaco* decisions are not the only cases where it was found that a PSD violation continues at least to the completion of construction. *See United States v. Ill. Power Co.*, 245 F. Supp 2d 951, 956 (S.D. Ill. 2003) (preconstruction permit violations do not "continue past the completion of construction"); *United States v. S. Ind. Gas & Elec. Co.*, No IP 99-1692-C-M/F, 2003 WL 1767052, at *5 (S.D. Ind. Feb. 18, 2003) (same). These courts' interpretations would avoid the absurd result outlined by the *Questar* court and the perverse incentives that follow, whereas Defendants' interpretation leads directly to such a result, clearly frustrating the enforcement provisions of the CAA, and therefore the CAA itself.

of a tolling agreement, but construction continued to occur and was ultimately concluded within that five-year period.[15]

In finding the United States' penalty claims timely, the *Questar* court concluded that the completion date of construction is more important to PSD considerations than the beginning date because:

> If the court were to conclude that the only date that matters is the initial date of construction, an owner or operator of a major emitting facility might purposely draw out the construction period in an effort to avoid the PSD requirements.

*Id.*  The court went on to note that if PSD violations vanish the day after construction begins, "a major emitting facility built over a longer period of time would not be subject to PSD requirements so long as the first day of construction occurred more than five years earlier.  Such a result is absurd."  *Id.*

**B.      Defendants Stretched Construction of the Project Over Five Years "To Avoid PSD Review."**

The Court need not look any further than the facts of this case to see such an absurd result.  Here, the Project began in January 2003 and concluded in 2008.  SOF ¶ 16.  Accepting Defendants' argument that PSD violations only occurred on the first day of construction in January 2003, the United States would be barred from bringing a claim for civil penalties if that claim was filed after January 2008.  But if the United States had brought a claim for civil penalties before 2008, Defendants would have surely argued that the claim was untimely because

---

[15] Defendants attempt to distinguish this case from *Questar* by stating that "[i]t is implicit to the *Questar* court's reasoning that the permitting authorities would have no way of finding out about the newly constructed facility at issue in that case other than through the PSD process."  (Dkt. 37-1 at 26.)  Whereas here, MDE was aware of the modification in question.  *Id.*  But in *Questar*, EPA became aware of the newly constructed facility at issue during its construction period, as Questar's predecessor "filed a Part 71 Federal Operating Permit Application with EPA" for the new facility in December 2000, and told EPA that the facility was expected to be operating in early 2001," as the United States informed the *Questar* court in the United States' Memorandum in Opposition to Questar's Motion for Partial Summary Judgment.  2:08-cv-00167-DAK-SA, Dkt. 316 at 21 (Nov. 5, 2010) (Ex. 24).

construction activities were ongoing.  So, the United States would be left in a precarious spot:
file suit within five years of the start of the ongoing Project without knowing if the Project is
complete, or wait to sue when the Project is over and forgo civil penalties.

Finding that the limitations period runs from the first day of construction results in an
even stranger situation where, as here, Defendants seem to have purposefully drawn out the
construction period in an effort "to avoid PSD review."[16]  While Defendants argue that they
"kept MDE apprised of the construction schedule" and that their "actions have been open and
forthcoming" (Dkt. 37-1 at 26-27), a closer look at their actions reveals otherwise.  They hid
behind their state construction permit, dragging out construction for years, in an attempt to avoid
or delay the expense of complying with PSD requirements.  While Defendants assured MDE that
their "construction activities" would reduce $SO_2$ emissions to pre-Project levels, they actually
viewed these activities as measures to increase production, SOF ¶¶ 27, 28, and in the case of at
least one construction activity touted by Defendants as a solution to the $SO_2$ emissions problem –
the installation of mixing air technology – they knew that it would not in fact reduce $SO_2$
emissions, SOF ¶ 34.

For example, in 2004, after upgrading the ID fan, $SO_2$ emissions increased "greater than
40 tons" and Defendants acknowledged that "[t]echnically we trigger PSD now."  SOF ¶ 24.
However, Defendants noted that if they submitted a PSD permit application, they would "almost
certainly" be required to install BACT "to meet a low, federally enforceable emissions limit,"
SOF ¶ 25, potentially a very large expense.  Apparently, this course of action was not palatable,
as they continued:

---

[16] The United States does not have evidence that Defendants took steps to draw out the construction
period for the *specific purpose* of running out the clock on the statute of limitations.  But taking steps to
draw out the construction period "to avoid PSD review" is no less absurd and the result is the same:
penalty claims for PSD violations could be time-barred before construction is complete.

> However, since the [state] construction permit has not been fully implemented,
> some options may still be available to avoid PSD review. … As long as MDE is
> in agreement that construction, as authorized under the permit, is ongoing, St.
> Lawrence should not be at risk due to the noted increase in SO2 emissions until
> after the completion of all construction activities.

*Id.*  This is not a valid reading of the PSD compliance obligations.  Once PSD is triggered, it

cannot be avoided or undone.[17]  Defendants should have complied with the law by obtaining a

PSD permit before construction or upon triggering PSD in 2004.  They should be continuously

applying BACT for $SO_2$.  Instead, Defendants hid behind the state construction permit for over

four more years and, to this day, are illegally emitting huge amounts of $SO_2$.

There is no better example of Defendants' drawn out construction activities than the

nearly six-year saga of mixing air technology.  MDE authorized St. Lawrence to install mixing

air in the 2002 state construction permit.  SOF ¶ 13.  Mixing air was touted by St. Lawrence as a

way to reduce $SO_2$ emissions.  SOF ¶ 14.  However, St. Lawrence did not install the mixing air

in 2003.  In 2004, St. Lawrence upgraded the ID fan to supply more air for combustion in the

kiln.  SOF ¶ 13, 21.  The upgraded ID fan did not reduce $SO_2$ emissions.  *See* SOF ¶ 23.  Still, St.

Lawrence did not immediately move to install mixing air thereafter.  Instead, it waited for over

two years – until June 2006 – just to lay the foundation for mixing air.  And it did not complete

its installation so that it could be operated until May 2007, after nearly another year had passed.

SOF ¶ 37.

The saga of mixing air did not end at Defendants' foot-dragging.  When they finally

installed mixing air in 2007, Defendants knowingly installed it in a place on the kiln that would

---

[17] EPA guidance provides that it is not appropriate "merely to allow a source to 'correct'" a violation by
returning to pre-violation conditions to avoid installing control equipment.  For example, a source that
illegally began burning "tires in a boiler could not avoid NSR review … merely by agreeing to reducing
the number of tires burned or by partial $SO_2$ controls." Guidance on the Appropriate Injunctive Relief for
Violations of Major New Source Review Requirements, Eric Schaeffer, Director, Office of Regulatory
Enforcement (Nov. 17, 1998) at 3 (Ex. 25).

have "minimal, if any" impact on $SO_2$ emissions.  SOF ¶ 34.  Mixing air can be installed on the kiln either uphill (away from the burner end) of the tire chute or downhill (closer to the burner end) of the tire chute.  An uphill mixing air location may reduce NOx emissions and allow for increased tire usage; a downhill location may reduce $SO_2$ emissions.  After learning that they would have to move the tire chute to install mixing air in a location that would reduce $SO_2$ emissions (a presumably expensive job) Defendants decided to install uphill mixing air only, "knowing that the SOx improvement will be minimal if any, in order to get further NOx reduction with increased tire substitution."  *Id.*  Unsurprisingly, uphill mixing air did not result in decreased $SO_2$ emissions to pre-Project levels.  *See* SOF ¶ 42.

Finally, in 2008, Defendants relocated the tire chute so that the mixing air injectors were downhill of the tire chute, the position in which reductions in $SO_2$ can be expected.  $SO_2$ emissions decreased somewhat, though not to pre-Project levels. *See* SOF ¶ 42.  Defendants submitted a PSD permit application in October 2008, after receiving a Notice of Violation from EPA.  SOF ¶¶ 43, 44.

Defendants should not be rewarded for running out the statute of limitations clock for civil penalties.  The Court should find that the clock began on the completion date of Project construction.

C.     **Perverse Incentives Result from a Finding that PSD Violations Vanish the Day After Construction Begins.**

By stretching out construction for years, Defendants have delayed and avoided the considerable expense of installation of pollution control equipment to meet BACT.  In avoiding this expense, Defendants have received an economic benefit of non-compliance.  Under Defendants' interpretation of PSD, the United would be unable to encourage compliance with the law.

31

III.   <u>Material Issues of Fact Exist Because the 2007 Changes Were Made Within the Statutory Period.</u>

If the Court finds that PSD violations occur on the first day of construction only and do not continue, it should still deny the Motion.  Material issues of fact exist as to whether the 2007 changes – the installation of the ID fan and the burner pipe, which began within five years of the tolling agreement – triggered PSD requirements on their own.  If that is the case, civil penalties are recoverable for those activities, even if the Court accepts Defendants' legal arguments on the statute of limitations.

There is evidence that the construction and operation of the 2007 changes violated PSD: they were undertaken to increase production volumes, SOF ¶ 27, which could result in significant emissions increases that trigger PSD review, SOF ¶ 28; and they were capital projects that cost millions of dollars, SOF ¶¶ 36, 37, 38.  The ID fan and burner pipe replacements in 2007 were undoubtedly taken with the objective of increasing kiln production.  SOF ¶ 27.  It is well known in the industry that increased kiln production potentially results in increased emissions.  There is no evidence that St. Lawrence informed MDE that increased kiln production was planned.  And St. Lawrence gave MDE no indication that the 2007 changes could trigger PSD requirements, as St. Lawrence's own environmental consultants expected.  SOF ¶ 28.

Even after St. Lawrence had upgraded the ID fan in 2004, it considered the ID fan to be the "major bottleneck for higher clinker production rates at present," and recommended replacement.  SOF ¶ 29.  This means that the Plant could not increase production amounts – and potentially emissions – without a larger fan.  However, when St. Lawrence approached MDE regarding the permitting of the ID fan replacement, they did not attempt to permit its replacement as part of MPR, or as a stand-alone project to remove a bottleneck for higher clinker production rates.  Rather, St. Lawrence told MDE that replacing the ID fan was an $SO_2$ control measure, the

purpose of which was to achieve the $SO_2$ emission reductions that were expected, but were not achieved, when the ID fan was upgraded in 2004. *Id.* Replacement of the ID fan took place in within the statute of limitations period (April 2007), SOF ¶ 36, did not result in a decrease in $SO_2$ emissions to pre-Project levels, *see* SOF ¶ 42, and came at a great expense (over $1,000,000), SOF ¶ 36.

Further, replacement of the kiln's burner pipe was identified as a "key project" and "priority topic" of the MPR, with an objective of increasing kiln production. SOF ¶ 30. But again, St. Lawrence told MDE that replacing the pipe was an $SO_2$ control measure. *Id.* Like the ID fan replacement, the burner pipe was replaced within the statutory period (April 2007) SOF ¶ 38, did not decrease $SO_2$ emissions to pre-Project levels, *see* SOF ¶ 42, and was expensive ($743,000), SOF ¶ 38. It is likely that both 2007 changes – the ID fan and burner pipe – triggered PSD review.

Further fact and expert discovery is needed to determine whether the construction activities that began within five years of the tolling agreement violated PSD independently of the construction activities that began in January 2003. Because material issues of fact exist, the Motion should be denied for civil penalty claims related to the 2007 changes.

## CONCLUSION

As described above, PSD violations are ongoing as a matter of law; the five-year statute of limitations has not run on the claims associated with the Project because it stretched into 2008; and material issues of fact exist as to whether the parts of the Project constructed in 2007 violated PSD independently of earlier phases of the Project. The motion should be denied.

Respectfully submitted,

FOR THE UNITED STATES

IGNACIA S. MORENO
Assistant Attorney General
Environment & Natural Resources Division
U.S. Department of Justice


By:    /S/ Peter J. Putignano
PETER J. PUTIGNANO
ERICA H. PENCAK
Trial Attorneys
Environmental Enforcement Section
Environment and Natural Resources Division
P.O. Box 7611
U.S. Department of Justice
Washington, DC 20044
Tel.: (202) 305-0354 (Putignano)
Tel.: (202) 514-1543 (Pencak)
Peter.Putignano@usdoj.gov
Erica.Pencak@usdoj.gov

ROD J. ROSENSTEIN
United States Attorney
District of Maryland

LARRY D. ADAMS
Assistant United States Attorney
36 South Charles Street, Fourth Floor
Baltimore, MD 21201
Tel: (410) 209-4800
Larry.Adams@usdoj.gov

OF COUNSEL

NATALIE L. KATZ
U.S. Environmental Protection Agency
1650 Arch Street
Philadelphia, PA 19103

ROBERT G. KLEPP
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460